EXHIBIT A

FILED CLERKS OFFICE
2004 JUN 24 A 11:32
U.S. DISTRICT COURT DISTRICT OF MASS.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| CYBEX INTERNATIONAL, INC. | ) | Civil Action No. 04 11846 DPW |
| Plaintiff, | ) | |
| v. | ) | **DECLARATORY JUDGMENT COMPLAINT FOR PATENT NON-INFRINGEMENT AND PATENT INVALIDITY** |
| BIOSIG INSTRUMENTS, INC., | ) | |
| Defendant. | ) | |

MAGISTRATE JUDGE RBC
RECEIPT #
AMOUNT $ 150.00 Cred. Card
SUMMONS ISSUED yes
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY. CLK. TOM
DATE 6/24/04

CYBEX INTERNATIONAL, INC. ("Cybex"), by way of Declaratory Judgment Complaint against Defendant Biosig Instruments, Inc. ("Biosig"), alleges as follows:

THE PARTIES

1. Plaintiff Cybex is a New York corporation having its headquarters and principal place of business at 10 Trotter Drive, Medway, Massachusetts, 02053.

2. Upon information and belief, Defendant Biosig is a Canadian Corporation having a place of business at 440-19th Ave., Suite 100, Lachine Quebec, Canada.

SUBJECT MATTER JURISDICTION

3. Biosig, through its legal counsel, has sent multiple letters to Cybex expressly charging Cybex with infringement of United States Patent Number 5,337,753 ("the '753 patent"), which Biosig purports to own. These letters expressly charge Cybex with infringement of the '753 patent, thereby creating a reasonable apprehension of suit on the part of Cybex and an actual controversy between Cybex and Biosig with respect to the '753 patent.

4. This declaratory judgment action arises under the patent laws of the United States, 35 U.S.C.§ 100 *et seq.* Therefore, subject matter jurisdiction is conferred upon this Court by 28 U.S. C §§ 1331, 1338, 2201, and 2202.

PERSONAL JURISDICTION AND VENUE

5. Upon information and belief, Biosig has transacted business within the Sate of Massachusetts and is otherwise subject to personal jurisdiction in Massachusetts.

6. Venue is proper in this Court under 28 U.S.C.§ 1391(b) because a substantial part of the events which give rise to these claims occurred in this District.

FIRST CAUSE OF ACTION

**DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF THE '753 PATENT**

7. Cybex incorporates all of the allegations contained in paragraphs 1 through 6 herein.

8. This is a claim by Cybex against Biosig seeking a declaratory judgment, pursuant to 28 U.S. C §§ 2201 and 2202, that the '753 patent is not valid and not infringed by Cybex.

9. Biosig purports to be the owner of the '753 patent.

10. Cybex has manufactured, sold and distributed health and fitness products incorporating heart rate monitoring devices.

11. Biosig, through its own actions, agents and otherwise, has expressly asserted that the manufacture, sale, and offer for sale of products incorporating heart rate monitoring devices by Cybex constitutes infringement of the '753 patent, thereby giving rise to a reasonable apprehension of suit on the part of Cybex and a resulting case or controversy between the parties relating to the '753 patent.

12. Cybex, through the manufacture, sale, and/or offer for sale of its health and fitness products incorporating heart rate monitoring devices has not and does not infringe the '753 patent either literally or through the doctrine of equivalents.

SECOND CAUSE OF ACTION

**INVALIDITY – OBVIOUSNESS**

13. Cybex incorporate paragraphs 1 – 12 herein as if set forth in full.

14. The subject matter allegedly claimed in one or more of the claims of the '753 patent would have been obvious to one skilled in the art and are invalid under 35 U.S.C. § 103.

THIRD CAUSE OF ACTION

**INVALIDITY - ANTICIPATION**

15. Cybex incorporate paragraphs 1 – 14 herein as if set forth in full.

16. The '753 patent contains claims that are anticipated by the prior art and that are invalid under 35 U.S.C. § 102.

**PRAYER FOR RELIEF**

**WHEREFORE**, Cybex prays for judgment as follows:

A. A declaration that Cybex, through the manufacture, use, sale or offer to sell of fitness products incorporating heart rate monitoring devices, does not infringe on any of the claims of the United States Patent Number 5,33,753;

B. A declaration that United States Patent Number 5,33,753 is invalid and unenforceable;

C. An award of costs;

D. A declaration that this case is an exceptional case pursuant to 35 U.S.C.§ 285, and that Cybex be awarded all of its attorneys fees; and

E. For such other and further relief that the Court deems equitable and just.

**GIBBONS, DEL DEO, DOLAN,**
**GRIFFINGER & VECCHIONE**
A Professional Corporation
One Riverfront Plaza
Newark, New Jersey 07102-5497
(973) 596-4500
(973) 596-0545 Facsimile

By: ______________________
**MARK P. KRONFELD (BBO # 630830)**
**DAVID E. DE LORENZI (Pro Hoc Vice Pending)**
**MICHAEL CUKOR (Pro Hoc Vice Pending)**
Attorneys for Plaintiff
Cybex International, Inc.

Dated: August 23, 2004

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. Title of case (name of first party on each side only) Cybex International, Inc. v. Biosig Instruments, Inc.

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet. (See local rule 40.1(a)(1)).

- [ ] I. 160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.
- [✔] II. 195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730, 740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950. *Also complete AO 120 or AO 121 for patent, trademark or copyright cases
- [ ] III. 110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310, 315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371, 380, 385, 450, 891.
- [ ] IV. 220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660, 690, 810, 861-865, 870, 871, 875, 900.
- [ ] V. 150, 152, 153.

3. Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?

YES [ ] NO [✔]

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest? (See 28 USC §2403)

YES [ ] NO [✔]

If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

YES [ ] NO [ ]

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

YES [ ] NO [x]

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).

YES [✔] NO [ ]

A. If yes, in which division do all of the non-governmental parties reside?

Eastern Division [✔] Central Division [ ] Western Division [ ]

B. If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?

Eastern Division [ ] Central Division [ ] Western Division [ ]

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)

YES [ ] NO [ ]

(PLEASE TYPE OR PRINT)

ATTORNEY'S NAME Mark P. Kronfeld, David E. De Lorenzi, Michael Cukor

ADDRESS Gibbons Del Deo, One Riverfront Plaza, Newark, New Jersey, 07102

TELEPHONE NO. 973-596-4500

JS 44 (Rev. 3/99)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**

Cybex International, Inc.

**DEFENDANTS**

Biosig Instruments, Inc.

(b) County of Residence of First Listed Plaintiff ____________
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Quebec, Canada
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)
MARK P. KRONFELD (BBO # 630830)
GIBBONS, DEL DEO, DOLAN, GRIFFINGER & VECCHIONE
One Riverfront Plaza, Newark, New Jersey 07102-5497
(973) 596-4500, (973) 596-0545 Facsimile

Attorneys (If Known)

04 11846 DPW

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

PERSONAL INJURY
- ☐ 362 Personal Injury Med. Malpractice
- ☐ 365 Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 444 Welfare
- ☐ 440 Other Civil Rights

**PRISONER PETITIONS**
- ☐ 510 Motions to Vacate Sentence Habeas Corpus:
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

**FORFEITURE/PENALTY**
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21 USC
- ☐ 630 Liquor Laws
- ☐ 640 R.R. & Truck
- ☐ 650 Airline Regs.
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt.Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc. Security Act

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☒ 830 Patent
- ☐ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS — Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900 Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions

**V. ORIGIN** (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district (specify) ☐ 6 Multidistrict Litigation ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

Declaratory Judgment of Patnet Invalidity and Non-Infringement 28 U.S. C §§ 2201 and 2202; 35 U.S. C §§ 102 and 103

**VII. REQUESTED IN COMPLAINT:** ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 **DEMAND $** CHECK YES only if demanded in complaint: **JURY DEMAND:** ☐ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY** (See instructions): JUDGE ____________ DOCKET NUMBER ____________

DATE August 23, 2004 SIGNATURE OF ATTORNEY OF RECORD [signature]

FOR OFFICE USE ONLY

RECEIPT # ________ AMOUNT ________ APPLYING IFP ________ JUDGE ________ MAG. JUDGE ________

EXHIBIT B

David E. De Lorenzi (DED-2692)
Michael Cukor (MC-0753)
E. Evans Wohlforth (EEW-1425)
**GIBBONS, DEL DEO, DOLAN GRIFFINGER & VECCHIONE**
One Pennsylvania Plaza
New York, NY 10119-3701
(212) 649-4700 (telephone)
(212) 333-5980 (facsimile)

Attorneys for Defendant,
Cybex International, Inc.

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BIOSIG INSTRUMENTS, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>CYBEX INTERNATIONAL, INC.,<br><br>Defendant. | Civil Action No. 04 6927 (RO)<br><br>**DECLARATION OF RAYMOND GIANNELLI IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS OR TRANSFER PURSUANT TO 28 U.S.C. § 1404(A)** |

I, **RAYMOND GIANNELLI**, do hereby state under penalty to perjury as follows:

1. I am the Chairman and Senior Vice President of Research and Development of Cybex International, Inc. ("Cybex"). I have personal knowledge of the facts set forth in this Declaration. I submit this Declaration in support of Cybex's motion to dismiss or transfer this action to the United States District Court for the District of Massachusetts.

2. I have reviewed the Complaint and its attachments filed in this action by plaintiff Biosig Instruments, Inc. ("Biosig").

3. Cybex maintains its principal place of business and manufacturing facility in Medway, Massachusetts. Its other facilities are located in Owatonna, Minnesota; Portland, Oregon; and the United Kingdom.

4. Cybex is a publicly-traded manufacturer of exercise equipment for use in commercial gyms and for in-home use by the public. Representative products are treadmills and exercise bikes. Cybex's worldwide sales in 2003 were approximately $83,000,000.

5. Cybex installs heart rate monitors supplied by other manufacturers in some models of its exercise equipment.

6. Prior to September of 1997, Cybex had its principal place of business in Ronkonkoma, New York.

7. In September 1997, Cybex merged with Trotter, Inc. of Medway, Massachusetts. The surviving entity retained the Cybex name.

8. In connection with the merger, Cybex removed its principal place of business, including all of its manufacturing equipment, personnel and records from Ronkonkoma, New York, to its new headquarters in Medway, Massachusetts.

9. Cybex has had no employees, offices or facilities located in New York since the move in 1997.

10. From 1996 until 1998, Biosig supplied heart rate monitors to Cybex.

11. The last shipment of Biosig heart rate monitors was received by Cybex in Medway, Massachusetts in the first half of 1998.

12. Cybex had no further dealings with Biosig after the last shipment of heart rate monitors was received in the first half of 1998.

13. Throughout the time Biosig supplied hear rate monitors to Cybex and continuously thereafter, Cybex purchased heart rate monitors from other suppliers in addition to Biosig.

14. No person involved with negotiating the Cybex/Biosig Confidentiality Agreement, attached as Exhibit B to the Certification of David E. De Lorenzi, Esq., is still employed by Cybex and Cybex currently has no information on any such person's whereabouts.

15. All personnel of Cybex with knowledge of Cybex's use of heart rate monitors are located in Medway, Massachusetts.

16. All documentary and physical evidence reflecting Cybex's use of heart rate monitors in its exercise equipment is located in Medway, Massachusetts.

17. Any personnel of Cybex with knowledge of the Biosig/Cybex Confidentiality Agreement, Cybex's performance under that agreement and the relationship between Cybex and Biosig, are located in Medway, Massachusetts.

18. Any documents or physical evidence reflecting Cybex's performance under the Confidentiality Agreement and the relationship between Cybex and Biosig are located in Medway, Massachusetts.

19. In August, 2004, it became clear that Biosig was simply not being reasonable and, moreover, that in light of the protracted history of threats and accusations against Cybex, that the cloud of Biosig's looming threats would not go away unless Cybex took legal action on its own to resolve the matter once and for all. Accordingly, on August 24, 2004, Cybex filed its patent declaratory judgment action in the District of Massachusetts.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 27, 2004

[signature]
**RAYMOND GIANNELLI**

#786221 v2
104480-51322

EXHIBIT C

16R0X9=M5KPNCS3
CYBEX INTERNATIONAL RR Donnelley ProFile BOSFBU-2K-PF006 8.2.15 BOS dutrj0bn 10-Mar-2004 10:48 EST 24791 TX 1 2*
FORM 10-K BOS CLN PS PMT 1C

# SECURITIES AND EXCHANGE COMMISSION

**WASHINGTON, D.C. 20549**

# FORM 10-K

**Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 For the Fiscal Year Ended December 31, 2003**

**Commission file number 0-4538**

# Cybex International, Inc.

**(Exact name of registrant as specified in its charter)**

| **New York** | **11-1731581** |
|---|---|
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |
| **10 Trotter Drive, Medway, Massachusetts** | **02053** |
| **(Address of principal executive office)** | **(Zip Code)** |
| **Registrant's telephone number, including area code** | **(508) 533-4300** |

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of Each Class | Name of each exchange on which registered |
|---|---|
| **Common Stock, $.10 Par Value** | **American Stock Exchange** |

**Securities registered pursuant to Section 12(g) of the Act:**

**NONE**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing required for the past 90 days. Yes [X] No [ ]

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. [X]

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Act). Yes [ ] No [X]

**The aggregate market value of the common stock held by non-affiliates of the registrant as of June 28, 2003 was $6,316,281.**

**The number of shares outstanding of the registrant's classes of common stock, as of March 12, 2004 Common Stock, $.10 Par Value — 8,868,107 shares**

**DOCUMENTS INCORPORATED BY REFERENCE**

The information required by Part III (items 10, 11, 12, 13 and 14) is incorporated by reference from the Registrant's definitive proxy statement for its Annual Meeting of Stockholders, to be filed with the Commission pursuant to Regulation 14A, or if such proxy statement is not filed with the Commission on or before 120 days after the end of the fiscal year covered by this Report, such information will be included in an amendment to this Report filed no later than the end of such 120-day period.

16R0X9=M5KYRSK3
CYBEX INTERNATIONAL RR Donnelley ProFile BOSFBU-2K-PF006 8.2.15 BOS dutrj0bn 10-Mar-2004 11:13 EST 24791 TX 2 2*
FORM 10-K BOS CLN PS PMT 1C

# PART I

## ITEM 1. *BUSINESS*

### General

Cybex International, Inc. (the "Company" or "Cybex"), a New York corporation, is a leading manufacturer of exercise equipment which develops, manufactures and markets premium performance, professional quality strength and cardiovascular fitness equipment products for the commercial and consumer markets. Cybex is comprised of three formerly independent companies, Cybex, Trotter Inc. ("Trotter") and Tectrix Fitness Equipment, Inc. ("Tectrix"). The Company also has a wholly-owned finance subsidiary, Cybex Capital Corporation ("CCC"), which arranges equipment leases and other financings for the Company's products, primarily to its commercial domestic customer base. The Company operates in one business segment.

### Products

The Company develops, manufactures, and markets premium performance, professional quality exercise equipment products for the commercial and consumer markets. These products can generally be grouped into two major categories: cardiovascular products and strength systems.

The Company's products are of professional quality and are believed to be among the best in the category in which they compete, featuring high performance and durability suitable for utilization in health clubs or by professional athletes. Accordingly, the majority of the Company's products are premium priced.

The contribution to net sales of the Company's product lines over the past three years is as follows (dollars in millions):

| | 2003 | | 2002 | | 2001 | |
|---|---|---|---|---|---|---|
| | **Net Sales** | **Percent** | **Net Sales** | **Percent** | **Net Sales** | **Percent** |
| Strength Systems | $42.6 | 47% | $42.0 | 52% | $47.1 | 55% |
| Cardiovascular Products | 42.9 | 48% | 35.0 | 43% | 33.8 | 40% |
| Freight Sales (1) | 4.7 | 5% | 4.5 | 5% | 4.3 | 5% |
| | $90.2 | 100% | $81.5 | 100% | $85.2 | 100% |

(1) Reflects shipping and handling fees and costs included in customer invoices.

#### *Cardiovascular Products*

The Company's cardiovascular equipment is designed to provide aerobic conditioning by elevating the heart rate, increasing lung capacity, endurance and circulation, and burning body fat. The Company's cardiovascular products include treadmills, a cross trainer, bikes and steppers. All of the Company's cardiovascular products incorporate computerized electronics which control the unit and provide feedback to the user.

*Treadmills.* The Company has three treadmill models, the Pro+, Trotter Elite and Sport+. The Trotter Elite is a consumer and light commercial product while the other models are for the commercial market. The Sport+ and Pro+ replace the prior Sport and Pro. These units employ a number of functional improvements over their predecessors. Each treadmill model is motorized and incorporates computerized electronics controlling speed, incline, display functions and preset exercise programs. The electronics also provide displays to indicate speed, elevation, distance, time, pace and a variety of other data. All of the treadmills include a complete diagnostic suite that can be accessed through the display, which is useful in the maintenance of the product. All models also include an innovative safety feature known as Safety Sentry™ which causes the treadmill to stop once it detects inactivity with the user. All treadmills are equipped with contact heart rate monitoring and the Stableflex™ deck

2

16R0X9=MB0R5Q33
CYBEX INTERNATIONAL RR Donnelley ProFile BOSFBU-2K-PF001 8.2.15 BOS browl0bn 11-Mar-2004 19:41 EST 24791 TX 3 3*
FORM 10-K BOS CLN PS PMT 1C

suspension system. The Trotter Elite and Pro+ also include Polar® heart rate monitoring capabilities. The Company's treadmills have list prices ranging from $5,695 to $6,495.

*Cross Trainer.* The Company introduced its cross trainer, the Cybex Arc Trainer, during 2002. The ArcTrainer is a commercial product designed to provide the club user with more and varied training potential. It provides motions that vary from gliding to climbing. Its brake design provides resistance from 0 – 900 Watts to meet the demands ranging from the casual user to the athlete. The control console is based on the Pro+ Treadmill console, facilitating cross-use of these products. The ArcTrainer's list price is $5,495.

*Bikes.* The Company has two bike models, series 700 and 500, representing commercial and consumer models, respectively, which are available in both upright and recumbent riding positions. The bikes incorporate an ergonomic design, epoxy powder-coat finish and a welded steel frame. The commercial model has a full-featured control console, with optional contact and Polar® heart rate monitoring. The consumer model has a simplified console suitable for low-support locations. These two products have list prices ranging from $2,099 to $2,999.

*Steppers.* The Company has three stepper models, series 800, 500 and 400. Models 800 and 500 represent products for the commercial market while the model 400 represents a product for the consumer market. All models feature a biomechanically correct design and patented drive technology. The model 800 features an advanced ergonomic handrail design with contact and Polar® heart rate monitoring, while a traditional design is used in the models 500 and 400. Each of the models has a console tailored to the type of use. These three products have list prices ranging from $2,499 to $3,199.

*Strength Training Products*

Strength training equipment provides a physical workout by exercising the musculo-skeletal system. The Company's strength training equipment uses weights for resistance. This product line includes selectorized single station equipment, modular multi-station units, MG500 multi-gym, PG400 personal gym, the FT360, plate-loaded equipment and free-weight equipment.

*Selectorized Equipment.* Selectorized single station equipment incorporates stacked weights, permitting the user to select different weight levels for a given exercise by inserting a pin at the appropriate weight level. Each selectorized product is designed for a specific muscle group with each product line utilizing a different technology targeted to facility and user type.

The Company's selectorized equipment is sold under the trademarks "VR2", "Eagle" and "VR". The VR2 and the Eagle represent premium lines. While the VR2 is appropriate for the average user, it also addresses the needs of the advanced user with patented technology which permits the user to target specific training. The Eagle line represents Cybex's newest premium line and was introduced in 2002 as a twelve piece line and was completed as a twenty piece line in 2003. This line provides the complete scope of use; it is easy to use and also meets the need of the demanding performance-based user with the advanced application of biomechanic principles. The VR represents a value-engineered line suitable for smaller general-purpose facilities and as an entry line in larger facilities. VR and VR2 featured aesthetic and functional updates in 2003. The Company currently sells approximately 93 selectorized equipment products with list prices between $2,125 and $5,095.

*Modular Multi-Station Units.* This product line has the advanced design and high performance features of the VR selectorized equipment line while being able to be configured into a multiple station design. The multi-station units begin at $1,525, with pricing depending on configuration.

*MG500 Multi-gym and PG400 Personal Gym.* The Company's multi (MG 500) and personal (PG 400) gyms feature over 30 biomechanically correct exercises. They are made of components including cold-rolled weight stacks and guide rods, fully welded 11 gauge frames, texture powder coating and upholstery. These gyms use

3

16R0X9=MCN16WF3
CYBEX INTERNATIONAL RR Donnelley ProFile BOSFBU-2K-PF003 8.2.15 BOS olsoc0bn 12-Mar-2004 12:26 EST 24791 TX 4 3*
FORM 10-K BOS CLN PS PMT 1C

considerably less space than multiple selectorized single station equipment. The multi-gym contains three weight stacks to meet the needs of the commercial market, especially hotels, corporate fitness centers and other small-scale locations. The personal gym contains one weight stack and is designed for home use. These products have a list price of $6,495 and $4,195, respectively.

*FT360.* The FT360 is a functional trainer that delivers an unlimited range of movements and exercises using arms that are capable of multiple positioning. This unit targets the personal training and rehabilitation markets and has a $3,995 list price.

*Plate Loaded Equipment.* The Company manufactures and distributes a wide range of strength equipment which mimics many of the movements found on its selectorized machines but are manually loaded with weights. These are simple products which allow varying levels of weight to be manually loaded. There are approximately 21 plate-loaded products, ranging in price from $825 to $2,690.

*Free-Weight Equipment.* The Company also sells free-weight benches and racks and compliments them with OEM supplied dumbbells, barbells and plates. The Company offers approximately 25 items of free-weight equipment with list prices ranging from $255 to $1,395.

**Customers and Distribution**

The Company markets its products to commercial customers and to individuals interested in purchasing premium quality equipment for use in the home. A commercial customer is defined as any purchaser who does not intend the product for home use. Typical commercial customers are health clubs, corporate fitness centers, hotels, resorts, spas, educational institutions, sports teams, sports medicine clinics, military installations and community centers. Sales to one customer, Cutler-Owens International Ltd., represented 10.7%, 10.0% and 10.5% of the Company's net sales for 2003, 2002 and 2001, respectively. No other customer accounted for more than 10% of the Company's net sales for 2003, 2002 or 2001.

The Company distributes its products through independent authorized dealers, its own sales force, international distributors and its e-commerce web site (www.cybexinternational.com). The Company services its products through independent authorized dealers, international distributors, a network of independent service providers and its own service personnel.

Independent authorized dealers operate independent stores specializing in fitness-related products and promote home and commercial sales of the Company's products. The operations of the independent dealers are primarily local or regional in nature. In North America, the Company publishes dealer performance standards which are designed to assure that the Company brand is properly positioned in the marketplace. In order to qualify as an authorized dealer, the dealer must, among other things, market and sell Cybex products in a defined territory, achieve sales objectives, have qualified sales personnel, and receive on-going product and sales training. As of March 12, 2004, the Company has approximately 70 active dealers in North America. The Company's domestic sales force services this dealer network and sells direct in regions not covered by a dealer. The domestic sales team includes 21 territory managers, three regional sales directors, one GSA director, one GSA manager, one national account director, one business development director and one Vice President.

The national account team focuses on major market segments such as health clubs and gyms, hotels, resorts, the U.S. government and organizations such as YMCAs, as well as third party consultants which purchase on behalf of such national accounts. The Company has approximately 30 national accounts.

Sales outside of North America accounted for approximately 28%, 26% and 27% of the Company's net sales for 2003, 2002 and 2001, respectively. The international sales force consists of one Vice President, one regional sales director, two sales managers and one operations manager. The Company, through its wholly-owned subsidiary, Cybex UK, directly markets and sells Cybex products in the United Kingdom and also

4

operates a distribution center in the United Kingdom which serves Cybex operations throughout Europe. Cybex UK has 20 employees. The Company utilizes independent distributors for the balance of its international sales. There are approximately 61 independent distributors in 65 countries currently representing Cybex. The Company enters into international distributor agreements with these distributors which define territories, performance standards and volume requirements.

Additional information concerning the Company's international sales and assets located in foreign countries is located in Note 2 to the Company's consolidated financial statements.

The Company markets certain products by advertising in publications which appeal to individuals within its targeted demographic profiles. In addition, the Company advertises in trade publications and participates in industry trade shows.

The Company offers leasing and other financing options for its commercial customers through Cybex Capital Corporation ("CCC"), its wholly-owned subsidiary. Prior to 2001, CCC leased equipment to customers and periodically sold lease receivables to financial institutions. Since 2001, CCC arranges financing for its dealers and direct sale customers through various third party lenders for which CCC receives fees. In addition to generating fee income, the Company believes that CCC's activities produce incremental sales of the Company's products.

**Warranties**

The various components of the cardiovascular products are warranted for varying periods, generally one to three years for labor and parts. The various components for strength products are warranted for varying periods of time, up to a ten-year warranty with respect to the structural frame. Warranty expense for the years ended December 31, 2003, 2002 and 2001 was $2,793,000, $1,224,000 and $1,603,000, respectively.

**Competition**

The market in which the Company operates is highly competitive. Numerous companies manufacture, sell or distribute exercise equipment. The Company currently competes primarily in the premium-performance, professional quality equipment segment of the market, which management estimates to be approximately 30% of the total exercise equipment market. Its competitors vary according to product line and include companies with greater name recognition and more extensive financial and other resources than the Company.

Important competitive factors include price, product quality and performance, diversity of features, warranties and customer service. The Company follows a policy of premium quality and differentiated features which results in products having suggested retail prices at or above those of its competitors in most cases. The Company currently focuses on the segment of the market which values quality and is willing to pay a premium for products with performance advantages over the competition. The Company believes that its reputation for producing products of high quality and dependability with differentiated features constitutes a competitive advantage.

**Product Development**

Research and development expense for the years ended December 31, 2003, 2002 and 2001 was $2,449,000, $2,842,000 and $2,684,000 respectively. At December 31, 2003, the Company had the equivalent of 29 employees engaged in ongoing research and development programs. The Company's development efforts focus on improving existing products and developing new products, with the goal of producing user-friendly, ergonomically and biomechanically correct, durable exercise equipment with competitive features. Product development is a cross functional effort of sales, marketing, product management, engineering and manufacturing, led by the Company's Senior Vice President of Research and Development.

16R0X9=M5KZXDF3
CYBEX INTERNATIONAL RR Donnelley ProFile BOSFBU-2K-PF006 8.2.15 BOS dutrj0bn 10-Mar-2004 11:13 EST 24791 TX 6 2*
FORM 10-K BOS CLN PS PMT 1C

**Manufacturing and Supply**

The Company maintains two facilities which are vertically integrated manufacturing facilities equipped to perform fabrication, machining, welding, grinding, assembly and finishing of its products. The Company believes that its facilities provide the Company with proper control over product quality, cost and delivery time.

The Company manufactures treadmill and bike cardiovascular products in its facility located in Medway, Massachusetts and manufactures the cross trainer and strength equipment in its facility located in Owatonna, Minnesota. Raw materials and purchased components are comprised primarily of steel, aluminum, wooden decks, electric motors, molded or extruded plastics, milled products, circuit boards for computerized controls and upholstery. These materials are assembled, fabricated, machined, welded, powder coated and upholstered to create finished products.

The Company's stepper products are manufactured for the Company in Taiwan.

The Company single sources its stepper products and certain raw materials and component parts, including drive motors, belts, running decks, molded plastic components and electronics, where it believes that sole sourcing is beneficial for reasons such as quality control and reliability of the vendor or cost. The Company attempts to reduce the risk of sole source suppliers by maintaining varying levels of inventory. However, the loss of a significant supplier, or delays or disruptions in the delivery of components or materials, or increases in material costs, could have a material adverse effect on the Company's operations.

The Company manufacturers most of its strength training equipment on a "build-to-order" basis which responds to specific sales orders. The Company manufactures its other products generally based upon projected sales.

**Backlog**

Backlog historically has not been a significant factor in the Company's business.

**Patents and Trademarks**

The Company owns, licenses or has applied for various patents with respect to its products and has also registered or applied for a number of trademarks. While these patents and trademarks are of value, the Company does not believe that it is dependent, to any material extent, upon patent or trademark protection.

**Insurance**

The Company's product liability insurance is written on a claims made basis and provides an aggregate of $5,000,000 of coverage, with a deductible of up to $500,000 per occurrence with an annual aggregate deductible of $1,000,000. The Company maintained an occurrence form policy from October 1998 to October 2002. This occurrence form policy also provided a seven year extended reporting period for the 1998 and previous claims made product liability policies.

**Governmental Regulation**

The Company's products are not subject to material governmental regulation.

The Company's operations are subject to federal, state and local laws and regulations relating to the environment. The Company regularly monitors and reviews its operations and practices for compliance with these laws and regulations, and the Company believes that it is in material compliance with such environmental laws and regulations. Despite these compliance efforts, some risk of liability is inherent in the operation of the business of the Company, as it is with other companies engaged in similar businesses, and there can be no assurance that the Company will not incur material costs in the future for environmental compliance.

6

16R0X9=MB0RW1Q3

CYBEX INTERNATIONAL RR Donnelley ProFile BOSFBU-2K-PF001 8.2.15 BOS browl0bn 11-Mar-2004 19:41 EST 24791 TX 7 3*

FORM 10-K BOS CLN PS PMT 1C

**Employees**

On March 12, 2004, the Company employed 486 persons on a full-time basis. None of the Company's employees are represented by a union. The Company considers its relations with its employees to be good.

**Risks Related to the Company's Business**

The risk factors identified in the cautionary statements below could cause our actual results to differ materially from those suggested in the forward-looking statements appearing elsewhere in this Report on Form 10-K. However, these risk factors are not exhaustive and new risks may also emerge from time to time. It is not possible for management to predict all risk factors or to assess the impact of all risk factors on our business or the extent to which any factor, or combination of factors, may cause actual results to differ materially from those contained in any forward-looking statements. Accordingly, forward-looking statements should not be relied upon as a prediction of actual results.

*Leverage.* The Company has incurred a substantial amount of bank indebtedness. This leverage may have several important consequences, including significant debt service and vulnerability to changes in interest rates. This leverage may also significantly limit the Company's ability to withstand adverse economic or business conditions and competitive pressures and to take advantage of any significant business opportunities that may arise. In particular, a continuation of the losses that have been experienced in recent years could result in the inability to meet debt service on or the financial covenants pertaining to the bank indebtedness, which could result in the acceleration of the debt.

*Losses; Reduced Sales.* In December 2000, in response to a fourth quarter 2000 decrease in net sales, the Company announced a restructuring plan designed to streamline operations, improve efficiency and reduce costs. Net sales increased in 2003 after continuing to decline in 2001 and 2002. Net sales for 2003, while approximately 28% below 2000 results, exceeded 2002 net sales by approximately 11%. The Company believes that the decrease in sales that began in 2000 was primarily due to economic conditions with the national recession having a strong impact on its business segment, and to tightened credit standards and other policies adopted as part of the restructuring plan, and that the increase in 2003 sales was largely based on sales of the ArcTrainer product introduced in the second half of 2002. While the Company had an operating profit in 2001, 2002 and 2003, it incurred losses in each year from 2000 through 2003. The incurrence of further losses or a further reduction of net sales could have a material adverse effect on the Company's business, prospects and financial condition.

*Control By Major Stockholders.* John Aglialoro, Joan Carter and UM Holdings Ltd., who are related parties, collectively own a majority of the outstanding common stock. In addition, UM Holdings Ltd. owns all of the outstanding shares of the Series B Convertible Cumulative Preferred Stock ("Series B Preferred Stock") which, if approved by the stockholders (which approval is assured), will become convertible from and after June 30, 2004 into 3,288,600 shares of common stock. Such shareholders have the ability to control or significantly influence (i) the election of the Board of Directors, and thus the direction in future periods and (ii) the outcome of all other matters submitted to the shareholders, including mergers, consolidations and the sale of all or substantially all of the Company's assets.

*Litigation.* The Company is involved in a variety of litigation, including with respect to product liability, intellectual property rights, disputes with dealers and a person from whom we acquired a business. An adverse determination in such litigation could have a material adverse effect on the Company's business, prospects or financial condition. The Company expects that it will continue to be subject to litigation in the ordinary course of business.

*Preferred Stock.* The Series B Preferred Stock has rights senior to the common stock, which could adversely affect the economic value of the common stock. For example, the terms of the Series B Preferred Stock include an obligation to pay cumulative dividends of 10% of the original issuance price ($4,900,000), before any dividends are paid to the holders of the common stock. Dividends not paid in any year accumulate and are

7

16R0X9=MB0T5SX3
CYBEX INTERNATIONAL RR Donnelley ProFile BOSFBU-2K-PF001 8.2.15 BOS browl0bn 11-Mar-2004 19:41 EST 24791 TX 8 3*
FORM 10-K BOS CLN PS PMT 1C

payable before any dividends are paid on the common stock. These cumulative dividends would deplete the Company's cash resources if paid in cash or, if paid in stock, would dilute the common stockholders. In the event of a liquidation, the holders of the outstanding Series B Preferred Stock also will receive an amount equal to the original issuance price plus all accrued but unpaid dividends, before any distributions are made to the holders of the common stock. Subject to approval at the 2004 Annual Meeting (which approval is assured), the outstanding Series B Preferred Stock will, from and after June 30, 2004, be convertible at the option of the holder into 3,288,600 shares of common stock. Additionally, if UM Holdings Ltd. suffers a loss with respect to certain collateral support provided to the Company, the Company will satisfy its reimbursement obligation by issuing additional shares of the Series B Preferred Stock. In addition, the Board has the ability to issue, without approval by the common stockholders, additional shares of the Series B Preferred Stock or another class of preferred stock, with the new class having such rights and preferences as the Board may determine in its discretion.

*Product Development.* The development and improvement of new and existing products is an important competitive factor in the Company's industry, and the Company's plan includes the continued development of cardiovascular and strength products. A failure of this development program, or the development of innovative products by the Company's competitors, could harm the Company's business.

*Competition.* The market in which the Company operates is highly competitive. Numerous companies manufacture, sell or distribute exercise equipment. The Company's competitors vary according to product line and include companies with greater name recognition and more extensive financial and other resources than the Company enjoys.

*Retention of Key Personnel.* The Company competes for the services of qualified personnel. The failure to retain and attract qualified personnel or the loss of any of the current key executives or key members of the staff could harm the Company's business.

*International Risks.* Approximately 28% and 26%, respectively, of sales in 2003 and 2002 were derived from outside the United States and Canada. Political or economic changes or currency fluctuations in countries in which the Company does business could harm its future revenues, expenses and financial condition.

**Available Information**

The Company files reports electronically with the Securities and Exchange Commission. Forms 10-Q, 10-K, Proxy Statements and other information can be viewed at http://www.sec.gov. The Company maintains its own website which can be viewed at http://www.cybexinternational.com.

**ITEM 2. *PROPERTIES***

The Company occupies approximately 120,000 square feet of space in Medway, Massachusetts and approximately 210,000 square feet of space in Owatonna, Minnesota for administrative offices, manufacturing, assembly and warehousing. These facilities are owned by the Company and are subject to mortgages securing the Company's credit facilities. The Company also utilizes outside warehousing.

Cybex UK, the Company's wholly-owned United Kingdom subsidiary, leases approximately 10,000 square feet of space in Northampton, England. This space is utilized for the subsidiary's direct sales and service efforts in the United Kingdom and for a distribution center which serves Cybex's operations throughout Europe.

Cybex Capital Corporation ("CCC"), the Company's wholly-owned subsidiary, leases approximately 600 square feet of space in Portland, Oregon. The space is utilized for the subsidiary's administrative and sales office.

The Company's manufacturing facilities are equipped to perform fabrication, machining, welding, grinding, assembly and powder coating of its products. The Company believes that its facilities provide adequate capacity for its operations for the foreseeable future, and the facilities are well maintained and kept in good repair.

8

16R0X9=MB4VHZS3
CYBEX INTERNATIONAL RR Donnelley ProFile BOSFBU-2K-PF003 8.2.15 BOS compj0bn 11-Mar-2004 21:08 EST 24791 TX 9 4*
FORM 10-K BOS CLN PS PMT 1C

Additional information concerning the financing of the Company's owned facilities is described in Note 3 to the Company's consolidated financial statements.

## ITEM 3. *LEGAL PROCEEDINGS*

As a manufacturer of fitness products, the Company is inherently subject to the hazards of product liability litigation; however, the Company has maintained, and expects to continue to maintain, insurance coverage which the Company believes is adequate to protect against these risks.

***Kirila et al v. Cybex International, Inc., et al***

This action was commenced in the Court of Common Pleas of Mercer County, Pennsylvania in May 1997 against the Company, the Company's wholly-owned subsidiary, Trotter, and certain officers, directors and affiliates of the Company. The plaintiffs include companies which sold to Trotter a strength equipment company in 1993, a principal of the corporate plaintiffs who was employed by Trotter following the acquisition, and a company which leased to Trotter a plant located in Sharpsville, Pennsylvania. In accordance with Pennsylvania practice, the complaint in this matter was not served upon the defendants until the second quarter of 1998. The complaint, among other things, alleged wrongful closure of the Sharpsville facility, wrongful termination of the individual plaintiff's employment and nonpayment of compensation, breach of the lease agreement and the asset purchase agreement, tortious interference with business relationships, fraud, negligent misrepresentation, unjust enrichment, breach of the covenant of good faith and fair dealing, conversion, unfair competition and violation of the Wage Payment and Collection Law. The complaint also sought specific performance of the lease, the employment agreement and the indemnification provisions of the asset purchase agreement, and an unspecified amount of compensatory and punitive damages and expenses. The Company filed an answer to the complaint denying the material allegations of the complaint and denying liability and it further asserted counterclaims against the plaintiffs, including for repayment of over-allocations of expenses under the lease and certain excess incentive compensation payments which were made to the individual plaintiff.

A jury verdict was rendered in this litigation on February 2, 2002. While the jury found in favor of the Company with respect to the majority of the plaintiffs' claims, it also found that the Company owes certain incentive compensation payments totaling approximately $873,000 and rent of approximately $38,000, plus interest. A motion is pending before the trial judge to award to the plaintiffs their attorneys fees and a further sum under the Wage Payment and Collection Law equal to 25% of the awarded compensation payments. In December 2002, plaintiff Kirila Realty and the Company agreed to enter judgment in favor of Kirila Realty in the amount of $48,750, on the claims related to lease issues. Such amount represented the approximately $38,000 jury verdict together with an agreed amount of interest due, and was paid by the Company in 2002.

As of February 6, 2004, no judgement has been entered on the remainder of the jury verdict, as the post-trial proceedings remain to be completed. The Company plans to vigorously pursue the appeal of any judgement entered in this matter.

***Hot New Products v. Cybex International, Inc., et al***

This action is in the United States District Court for the Northern District of Alabama. The plaintiff in this action is a terminated dealer of Trotter. Shortly after the termination, plaintiff filed a State action against Trotter and Cybex, alleging fraud, breach of contract, unjust enrichment and recoupment. The plaintiff also sued another Cybex dealer alleging intentional interference with business relations. In July 1998, the plaintiff filed this antitrust Complaint in federal court, alleging price discrimination and price and territory conspiracy violations. The State court case was dismissed with the State court claims refiled as part of this federal action. The plaintiff is seeking approximately $3,500,000 in compensatory damages, plus treble damages for the antitrust claims and

9

16R0X9=MB0W2V03
CYBEX INTERNATIONAL RR Donnelley ProFile BOSFBU-2K-PF001 8.2.15 BOS browl0bn 11-Mar-2004 19:41 EST 24791 TX 10 3*
FORM 10-K BOS CLN PS PMT 1C

punitive damages. The Company has filed an answer to the complaint denying the material allegations of the complaint and denying liability and has filed a counterclaim for fraud, promissory estoppel and intentional interference with business relations. On August 14, 2003, the Court issued a ruling dismissing most of the plaintiff's causes of action as well as all of the counterclaims asserted by Cybex. The Court allowed two of the plaintiff's claims, one Federal claim and one State claim, to proceed to trial. Trial began on this matter on January 20, 2004. Immediately prior to trial, the plaintiff dismissed its State claim and elected to proceed to trial only on the Federal claim. On January 29, 2004 the jury returned a verdict in favor of Cybex. On February 13, 2004, the Plaintiff filed a motion for a new trial, which the Company intends to vigorously oppose.

***Colassi v. Cybex International, Inc.***

This action is in the United States District Court for the District of Massachusetts. The plaintiff alleges that certain of the Company's treadmill products infringe a patent allegedly owned by the plaintiff. The plaintiff seeks injunctive relief and monetary damages. The Company has filed an answer to the complaint denying the material allegations of the complaint and has asserted counterclaims. In October 2003, the Court held a preliminary hearing regarding the scope of the claims in this matter. As of February 6, 2004, the Court had not reached a decision regarding the matters at issue in that hearing. The Company intends to vigorously defend this litigation and prosecute its counterclaims.

***Free Motion Fitness v. Cybex International, Inc.***

On December 31, 2001, Free Motion Fitness (f.k.a. Ground Zero Design Corporation) filed an action for patent infringement against the Company alleging that the Company's FT 360 Functional Trainer infringed U.S. Patent No. 6,238,323, allegedly owned by Free Motion Fitness. The Company did not receive service on this matter until April 2, 2002. The action was filed in the United States District Court for the District of Utah. The Company has filed an answer that includes claims which the Company believes could invalidate the Free Motion Fitness patent and has also filed a counterclaim against Free Motion Fitness seeking damages. On September 27, 2003, this case was combined with a separate matter also in the United States District Court, Division of Utah in which Free Motion Fitness had sued the Nautilus Group for infringement of the same patent at issue in the Cybex case. Since that time, additional summary judgment motions have been filed by Cybex, Free Motion Fitness and Nautilus Group. On December 31, 2003, the Court issued its Memorandum Opinion and Order regarding the various summary judgment motions of Cybex, Free Motion and Nautilus. In its opinion, the Court denied Free Motion's summary judgment request, granted Cybex's motion for summary judgment with regard to literal infringement but denied Cybex's motion for summary judgment under the doctrine of equivalents, and granted Nautilus' summary judgment request on literal infringement. On February 4, 2004, the Company filed a motion with the Court for complete summary judgment of nonfringement literally and under the doctrine of equivalents.

***Other Litigation and Contingencies***

The Company is involved in certain other legal actions, contingencies and claims arising in the ordinary course of business.

Legal fees related to these matters are charged to expense as incurred. For the year ended December 31, 2001, the Company recorded a pre-tax charge of $2,200,000 with respect to the Kirila litigation and other contingencies.

## ITEM 4. *SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS*

No matters were submitted to a vote of the Company's security holders during the fourth quarter of 2003.

10

EXHIBIT D

# CYBEX INTERNATIONAL, INC.
## CONFIDENTIALITY AGREEMENT

Parties

1. Biosig Instruments Inc., a company incorporated under the laws of Canada whose registered office is at 440 19th Ave., Lachine , Quebec H8S 3S2 (including any U.S. subsisidiary of the company )

2. CYBEX INTERNATIONAL, INC. whose address is at 2100 Smithtown Avenue, Ronkonkoma, New York 11779.

Hereinafter called the Parties, a Disclosing or Receiving Party as the context so requires.

WHEREAS

1. The Parties wish to disclose and exchange Information (as defined herein) for the purpose of a possible collaboration between the parties ("The Authorized Purpose").

2. Such Information will be of a proprietary or confidential nature and the Parties, therefore, agree that such disclosure should be made under the conditions of confidentiality contained in this Agreement.

IT IS HEREBY AGREED

1. "Information" shall mean: all data, reports, Interpretations, forecasts, records, drawings, documentation, software, prototypes, samples, know-how, formulae, processes, designs, photographs, specifications, instructions, commercial, financial and other Information whether in oral, written, machine readable or any other form provided or disclosed by one of the Parties to the other relevant to or in pursuance of the Authorized Purpose.

2 In consideration of the disclosure and exchange of Information between them, the Parties hereby undertake:

2.1 To use Information only for the Authorized Purpose and strictly in accordance with the terms of this Agreement and not to otherwise use, exploit or copy the same without prior written agreement of the Disclosing Party.

2.2 To maintain confidential all Information and not to divulge the same to any third party (without prior written consent of the Disclosing Party).

2.3 To restrict dissemination or disclosure of Information within its organization to such employees (and external professional advisers) who have a need to know the same in furtherance of the Authorized Purpose PROVIDED THAT disclosure to external professional advisers shall not be made without prior written consent of the Disclosing Party and on the basis that such employees and advisers shall be made aware of and undertake to strictly observe the confidentiality obligations created by this Agreement.

2.4 To keep separate all Information and all Information generated by the Receiving Party based thereon from all documents and other records of that Party.

2.5 To keep all documents and any other material bearing or incorporating any of the Information at the usual place of business of the Receiving Party.

2.6 Not to use, reproduce, transform, or store any of the Information in an externally accessible computer or electronic Information retrieval system or transmit it in any form or by any means whatsoever outside of its usual place of business.

2.7 To make copies of the Information only to the extent that the same is strictly required for the Authorized Purpose.

2.8 On request of the Disclosing Party at any time to deliver up to that Party all documents and other material in the possession custody or control of the Receiving Party that bear or incorporate any part of the Information.

3. For the avoidance of doubt ownership of all its rights in Information will remain with the Party providing the same. No license whatsoever is granted or implied hereunder in respect of the Information (beyond such as may be strictly necessary for the Receiving Party to use the Information to perform its obligations in pursuance of the Authorized Purpose during the period of this Agreement).

4. This agreement shall not apply to any Information which:

4.1 At the date of this Agreement is in the public domain or subsequently comes into the public domain through no fault of the Receiving Party and not in breach of this Agreement,

4.2 Was already known to the Receiving Party on the date of disclosure through a proper and lawful source, provided that such prior knowledge can be substantiated and proved by documentation;

4.3 Property a...d lawfully becomes available to the Receiving Party from sources independent of the Disclosing Party.

5. On termination of this Agreement all Information and copies made thereof shall be returned to the Disclosing Party or destroyed at that Party's direction.

6. This Agreement shall be effective from the date hereof or commencement of discussions or activities in anticipation of the Authorized Purpose if earlier. It shall continue for a period of five years or until completion of the Authorized Purpose whichever is the earlier subject to extension by mutual agreement of the Parties PROVIDED ALWAYS that the obligations contained in Clause 2 shall survive expiry or termination for whatever cause.

7. This Agreement constitutes the entire understanding between the Parties with respect to its subject matter and cannot be changed except by written agreement between the Parties.

8. This Agreement shall be governed and construed as a contract made in New York according to the laws of New York and each Party hereby submits to the jurisdiction of the New York Courts, in any action or proceeding with respect to this Agreement, including the federal district courts located in the State of New York. The parties agree they may be served with process at the addresses set forth on the first page hereof.

Agreed and Accepted:

BIOSIG INSTRUMENTS, INC.

James Moffat

Jim Moffat
Vice President

August 27/96
Date

Agreed and Accepted:

CYBEX INTERNATIONAL, INC.

Stephanie Angove

Stephanie Angove
Project Manager, Cardiovascular Products

August 28/96
Date

A8908.1

MAY-19-1999 10:16 802 635 7635 98% P.07

EXHIBIT E

09/29/2004 18:22 514-6371353 BIOSIG INSTRUMENTS PAGE 01

# Biosig Instruments Inc.

**biomedical instrumentation: design and manufacture**

## INVOICE

**SOLD TO:** CYBEX
10 TROTTER DRIVE
MEDWAY
MA 02053

**INVOICE #:** 8933
**Date:** Feb 25, 2000
**OUR ORDER:** 5584
**CUSTOMER #:** 80784
**TERMS :** NET/30
**SHIP VIA:** U P S

**ATTN:** MIKE PAPULIS
**TEL:**
**FAX:**

**SHIP TO:** **SAME**

| QUANTITY | DESCRIPTION | BACK ORDER | UNIT | AMOUNT |
|---|---|---|---|---|
| 250 | SENSORS<br>YOUR PART # 3900-356<br>(9" leads) | | $24.75 | $6187.50 |
| | SHIPPING | | | $50.00 |
| | TOTAL | | | $6237.50 |

INVOICE

**HEAD OFFICE:** 440-19th Ave., Suite 100, Lachine, Quebec, Canada H8S 3S2
**U.S.MAILING ADDRESS:** P.O.Box 860, Champlain, New York 12919

**Tel:** (514) 637-0016 **Fax:** (514) 637-1353

EXHIBIT F

Biosig Instruments Inc.

440 19 Ave., Suite 100
Lachine, Que., H8S 3S2
Canada

Phone 514 6370016
Fax 514 637 1353

April 30, 1999

without prejudice

Cybex International
Attn: Mike Sweeney
10 Trotter Drive
Medway, MA 02035

Dear Mike,

As per our conversation of April 29, 1999, please let me outline briefly the points of discussion:

1. It is obvious to Biosig that Cybex is infringeing on Biosig 4 sensor patented heart rate technology.

2. It is also clear to Biosig that Cybex is breaching on a 5 year confidentiality agreement signed between Biosig Instruments Inc. and Cybex International on August 26 and 27, 1996.

3. It is clear to Biosig that Cybex is breaching on the commitment of purchase order #80784-Item 3.

4. According to the documents it is clear that Biosig helped Cybex to develop a heart rate monitoring system including the design of electrodes, wire assemblies, printed circuit boards, software, and hardware configurations. All of this work which contains confidential

technical information was provided to Cybex free of charge based on the good will which was generated by the signing of the confidentiality contract between Cybex International and Biosig Instruments.

5. It is clear to Biosig that Cybex delayed a 3,000 unit order for many months. During this period Cybex was working in parrellel sharing Biosig patented technology with Tectrix, Polar, and other competitors of Biosig.

6. We have agreed it is very important to find an immediate solution to the problem.

7. You have requested a copy of the agreement which I am forwarding to you by fax. Please note that besides this our files contain numerous correspondences between the engineers of Biosig Instruments and Cybex International which supports Biosig understanding that Cybex is infringeing and breaching on the contract.

Biosig is looking forward to your immediate attention to the above problems.

Sincerely,

Gregory Lekhtman
President

BIOSIG INSTRUMENTS INC.

FAX - COVER PAGE

TO: Cybex International = Mike Sweeney

From: Biosig Instruments, Inc. = Gregory Lekhtman

No. of pages(including this page) = 6

Description: Letter and signed documents.

Date sent: April 30, 1999

Direct line: 514-637-1758
Fax line: 514-637-1353

# CYBEX INTERNATIONAL, INC.
# CONFIDENTIALITY AGREEMENT

**Parties**

1. Biosig Instruments Inc., a company incorporated under the laws of Canada whose registered office is at 440 19th Ave., Lachine, Quebec H8S 3S2 (including any U.S. subsisidiary of the company)
2. CYBEX INTERNATIONAL, INC. whose address is at 2100 Smithtown Avenue, Ronkonkoma, New York 11779.

Hereinafter called the Parties, a Disclosing or Receiving Party as the context so requires.

WHEREAS

1. The Parties wish to disclose and exchange Information (as defined herein) for the purpose of a possible collaboration between the parties ("The Authorized Purpose").
2. Such Information will be of a proprietary or confidential nature and the Parties, therefore, agree that such disclosure should be made under the conditions of confidentiality contained in this Agreement.

IT IS HEREBY AGREED

1. "Information" shall mean: all data, reports, interpretations, forecasts, records, drawings, documentation, software, prototypes, samples, know-how, formulae, processes, designs, photographs, specifications, instructions, commercial, financial and other Information whether in oral, written, machine readable or any other form provided or disclosed by one of the Parties to the other relevant to or in pursuance of the Authorized Purpose.
2. In consideration of the disclosure and exchange of Information between them, the Parties hereby undertake:

   2.1 To use Information only for the Authorized Purpose and strictly in accordance with the terms of this Agreement and not to otherwise use, exploit or copy the same without prior written agreement of the Disclosing Party.

2.2 To maintain confidential all Information and not to divulge the same to any third party (without prior written consent of the Disclosing Party).

2.3 To restrict dissemination or disclosure of Information within its organization to such employees (and external professional advisers) who have a need to know the same in furtherance of the Authorized Purpose PROVIDED THAT disclosure to external professional advisers shall not be made without prior written consent of the Disclosing Party and on the basis that such employees and advisers shall be made aware of and undertake to strictly observe the confidentiality obligations created by this Agreement.

2.4 To keep separate all Information and all Information generated by the Receiving Party based thereon from all documents and other records of that Party.

2.5 To keep all documents and any other material bearing or incorporating any of the Information at the usual place of business of the Receiving Party.

2.6 Not to use, reproduce, transform, or store any of the Information in an externally accessible computer or electronic Information retrieval system or transmit it in any form or by any means whatsoever outside of its usual place of business.

2.7 To make copies of the Information only to the extent that the same is strictly required for the Authorized Purpose.

2.8 On request of the Disclosing Party at any time to deliver up to that Party all documents and other material in the possession custody or control of the Receiving Party that bear or incorporate any part of the Information.

3. For the avoidance of doubt ownership of all its rights in Information will remain with the Party providing the same. No license whatsoever is granted or implied hereunder in respect of the Information (beyond such as may be strictly necessary for the Receiving Party to use the Information to perform its obligations in pursuance of the Authorized Purpose during the period of this Agreement).

4. This agreement shall not apply to any Information which:

4.1 At the date of this Agreement is in the public domain or subsequently comes into the public domain through no fault of the Receiving Party and not in breach of this Agreement;

4.2 Was already known to the Receiving Party on the date of disclosure through a proper and lawful source, provided that such prior knowledge can be substantiated and proved by documentation;

4.3 Properly and lawfully becomes available to the Receiving Party from sources independent of the Disclosing Party.

5. On termination of this Agreement all Information and copies made thereof shall be returned to the Disclosing Party or destroyed at that Party's direction.

6. This Agreement shall be effective from the date hereof or commencement of discussions or activities in anticipation of the Authorized Purpose if earlier. It shall continue for a period of five years or until completion of the Authorized Purpose whichever is the earlier subject to extension by mutual agreement of the Parties PROVIDED ALWAYS that the obligations contained in Clause 2 shall survive expiry or termination for whatever cause.

7. This Agreement constitutes the entire understanding between the Parties with respect to its subject matter and cannot be changed except by written agreement between the Parties.

8. This Agreement shall be governed and construed as a contract made in New York according to the laws of New York and each Party hereby submits to the jurisdiction of the New York Courts, in any action or proceeding with respect to this Agreement, including the federal district courts located in the State of New York. The parties agree they may be served with process at the addresses set forth on the first page hereof.

Agreed and Accepted:

BIOSIG INSTRUMENTS, INC.

James Moffat

Jim Moffat
Vice President

August 27/96
Date

Agreed and Accepted:

CYBEX INTERNATIONAL, INC.

Stephanie Angove

Stephanie Angove
Project Manager, Cardiovascular Products

August 28/96
Date

A8908/1

EXHIBIT G

 **Biosig Instruments Inc.**

P.O. Box 860
Champlain,N.Y. 12919

Phone: 514 637- 0016, Fax: 514 637- 1353, Toll free:1-800 463-5470

May 20, 1999

Cybex International
Attn: Peter Haines/President
10 Trotter Drive
Medway, MA 02053

Dear Peter,

It has been many years since I have seen you. I am happy to discover that you are the president of Cybex International.

As you are aware Biosig Instruments Inc. is a supplier for Cybex of Biosig patented heart rate sensors. You know that Biosig was a pioneer of contact heart rate monitors which are recognized worldwide for their uniqueness. The Biosig patented principle of 4 sensors is now starting to be understood by our competitors who have decided to infringe on Biosig intellectual property without realizing that Biosig technology is covered by several patents.

Some people who infringed on us didn't know about our Canadian patent#02033014 of December 21, 1990, or my United States patent#DES254569 of March 25, 1980. Both patents describe very well the physiological principles behind 4 sensor monitors which have been many years work of discovery and experience done by Biosig Instruments. Cybex International recognized the Biosig technology and the principles behind it and signed with Biosig Instruments a non-disclosure agreement which led to the development of a special sensor for Cybex.

Biosig engineers helped Cybex engineers to develop the product which is used on several Cybex exercise machines. Cybex has placed several orders with Biosig and Biosig has filled these orders with a great appreciation, in writing, by Cybex purchasing department. Cybex purchasing department gave Biosig Instruments excellent quality reports.

Cybex placed an order with Biosig for 3,000 units, which is current and has not been shipped due to delays by Cybex. Biosig gave Cybex an excellent product and licensing fees. Suddenly the shipments have been postponed with the explanation that Cybex has internal problems with its suppliers.

Myself, during the IHRSA Show 99 in San Diego, I discovered that Cybex started to infringe on Biosig patented technology. I have sent letters to Mike Papulis and Mike Sweeney(enclosed) to which I have received no answers.

I am forwarding these letters to you and I hope that we will resolve this matter promptly.

Looking forward to hearing from you.

Best regards,

Gregory Lekhtman

Gregory Lekhtman
(signed for Mr. Lekhtman by Sandy Ruoss, secretary).

cc: Alex S. Konigsberg, Q.C.
Attorney at Law/Lapointe, Rosenstein